```
 1               IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
   EDWARD JOSEPH MCNATT,        :
 3        Petitioner           :
                               :
 4           v.                : Case No. 05-124
                               :
 5   JUDGE OLIVER J. LOBAUGH,   :
   et al.,                     :
 6        Respondents          :

 7

 8

 9           Hearing held in the above-captioned matter

10      on Thursday, January 24, 2008, commencing at

11      10:20 a.m, before the Honorable Susan Paradise

12      Baxter, United States Courthouse, 17 South Park

13      Row, Erie, PA 16501.

14

15

16   For the Petitioner:

17        Thomas W. Patton, Esquire
          Assistant Federal Public Defender
18        1111 Renaissance Centre, 1001 State Street
          Erie, PA 16501
19

20   For the Respondents:

21        Brenda J. Servidio, Esquire
          District Attorney's Office
22        Venango County Courthouse
          P.O. Box 831
23        Franklin, PA 16323

24

25                Reported by Sonya Hoffman
              Ferguson & Holdnack Reporting, Inc.
```

1                          I N D E X

2

3

4    EDWARD JOSEPH MCNATT

5          Direct Examination by Mr. Patton . . . . . . . 4

6          Cross-Examination by Ms. Servidio. . . . . . .22

7          Redirect Examination by Mr. Patton . . . . . .32

8          Recross-Examination by Ms. Servidio. . . . . .32

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. WALLEN:  All rise.  The Honorable Susan Paradise

2     Baxter now presiding in the Unites States District Court of

3     the Western District of Pennsylvania.  You may be seated.

4          The case before the Court is Edward Joseph McNatt

5     versus Judge Oliver J. Lobaugh, et al.  It's docketed at

6     Civil Action 05-124 Erie.  Representing the Petitioner is

7     Thomas Patton.  Representing the Respondent is Brenda

8     Servidio.

9          THE COURT:  Ms. Servidio, thank you for braving the

10    roads to get here.

11         All right.  We are here today on the order of Judge

12    McLaughlin to revisit the issue of exhaustion and the

13    miscarriage of justice.  Is that your understanding,

14    Mr. Patton?

15         MR. PATTON:  No, Your Honor.  I believe we are here

16    today for just the merits of the claim because I filed my

17    brief in support of why he perceived the default should be

18    waived because of a miscarriage of justice.

19         The Respondents did not file any response at all, so

20    Your Honor issued an order setting an evidentiary hearing on

21    the merits.

22         THE COURT:  On the claims, all right.  I thought we

23    were going to go through that as well, never mind.  Is that

24    your understanding, Ms. Servidio?

25         MS. SERVIDIO:  My understanding is that we were going

1    to have an evidentiary miscarriage of justice hearing.

2        THE COURT:  And by that we'd be going on the claim

3    anyway.  Is that not how you saw it, Mr. Patton?

4        MR. PATTON:  No.

5        THE COURT:  All right.  Let me see what my order says.

6        MR. PATTON:  The order says that the Petitioner's

7    motion for an evidentiary hearing on the issues raised in

8    his petition for a writ of habeas corpus is hereby granted.

9    The evidentiary hearing is set for January 24th at 10:00

10   a.m.

11       THE COURT:  We're good.  I have all the papers here,

12   let's do it.  It's your petition, Mr. Patton, and you're on.

13       MR. PATTON:  Your Honor, we would call Edward McNatt.

14

15       E D W A R D  M C N A T T, first having

16       been duly sworn, testified as follows:

17

18       MS. WALLEN:  Please be seated.  Please state your full

19   name and spell your last name for the record.

20       MR. MCNATT:  Edward Joseph McNatt, M-C-N-A-T-T.

21

22                    DIRECT EXAMINATION

23   BY MR. PATTON:

24

25       Q.   Edward, you're the Petitioner in this case.

 1       A.   Yes.

 2       Q.   Okay.  I want to ask you some questions about the

 3  events that occurred back in July and August of 1997 and

 4  then the months that followed, all right?

 5       A.   Uh-huh.

 6       Q.   Okay.  In July of 1997, did you steal a checkbook

 7  from Frances and William Reese?

 8       A.   Yes.

 9       Q.   After you stole that checkbook, did you forge a

10  check from the checkbook in Lackawana County?

11       A.   Two of them, I believe.

12       Q.   Where did you go after that?

13       A.   Venango County, Oil City.

14       Q.   Did you pass some checks from the checkbook in

15  Venango County?

16       A.   Yes.

17       Q.   Roughly, do you recall, roughly, what dates those

18  were?

19       A.   July.

20       Q.   What did you do after passing the checks in

21  Venango County?

22       A.   I went to Vermont.

23       Q.   How quickly after passing the checks in Venango?

24       A.   Same day.  The date of the last check, the same

25  day.

1      Q.    Where did you go in Vermont?

2      A.    Essex Junction.

3      Q.    And did you return to the Lackawana County area

4  from Vermont?

5      A.    Yes.

6      Q.    How long --

7      A.    A couple of days later.

8      Q.    And what happened when you got back into the

9  Lackawana County area?

10     A.    Well, I was wanted on a detainer for Lackawana

11 County for receiving stolen property and that checkbook.

12 Somebody called the police and I was pulled over at that

13 time and arrested.

14     Q.    Do you remember that date?

15     A.    Yes, pretty much.

16     Q.    Do you recall what date that was?

17     A.    That was actually July 19th.  It says the 20th, it

18 was actually the 19th.  Late on the 19th, I was arrested.

19     Q.    Have you ever been free from incarceration from

20 that day until today?

21     A.    No.

22     THE COURT:  That was July 19th?

23     MR. PATTON:  Yes, ma'am.

24     Q.    After you were arrested in Lackawana County, did

25 the charges in Lackawana County proceed against you?

1      A.    Yes.

2      Q.    Okay.  And did that include one set of charges

3   that dealt with the checkbook from the Reeses and then there

4   was a separate retail charge that was unrelated?

5      A.    Yes.

6      Q.    Did you ultimately end up being sentenced in

7   Lackawana County on those charges?

8      A.    Yes.

9      Q.    Do you recall the sentence that you got?

10     A.    One and a half to three years -- I don't even

11  remember.

12     Q.    Okay.  After you got sentenced in Lackawana

13  County, where did you go?

14     A.    Vermont.  From Lackawana County, we were sent to

15  Graterford, from Graterford to Camp Hill.

16     Q.    When you go to Camp Hill -- well, let me back up

17  for a second.  From the time you got arrested in Lackawana

18  County until the time you got sentenced and sent to

19  Graterford, where did you stay?

20     A.    Lackawana County jail.

21     Q.    Okay.  And from the Lackawana County jail, then to

22  Graterford and then to Camp Hill.

23     A.    Uh-huh.

24     Q.    While you were at Camp Hill, did there ever come a

25  time when you were taken out of Camp Hill and taken to Oil

1    City?

2        A.    Yes.  Detective Tanner and some other detective

3    from the Pennsylvania State Police came with a warrant for

4    checks that I forged in Lackawana County.

5        Q.    Detective Tanner.

6        A.    Yes.

7        Q.    T-A-N-N-E-R.

8        A.    Yes, and somebody else.

9        Q.    And a trooper with the State Police.

10       A.    Yes.

11       Q.    Okay.  When you got to Oil City, what happened?

12       A.    Well, we discussed the checks.  They showed me a

13   copy of the checks, asked if I cashed them checks, I told

14   him I did, and I went for arraignment on those checks.

15       Q.    Did they ask you about if there were any other

16   checks of the Reeses out there that you had maybe passed

17   that had come to light?

18       A.    Yeah.  Later my attorney asked me if there was,

19   trying to clear it all up.

20       Q.    When you were questioned in Oil City, was it just

21   the State Police that were questioning you, or was there

22   someone from Oil City there, too?

23       A.    There was an Officer Schattauer from the Oil City

24   Police Department questioning me.

25       Q.    Did Officer Schattauer ask you about whether or

1  not there were any other checks from the Reeses that were

2  out there?

3      A.  Yes, he did.  He actually came to the Lackawana --

4  or Venango County jail and talked to me.  I didn't go to Oil

5  City, he came to the jail to speak the me.

6      Q.  Okay.  And when Officer Schattauer -- and I

7  believe that is spelled S-C-H-A-T-T-A-U-E-R -- when he asked

8  you about other checks, what did you tell him about other

9  checks or where the actual checkbook was?

10      A.  I explained that there were no other checks out

11  there that I knew of at the time, I didn't think so.  And

12  the fact that the Vermont State Police got the checkbook out

13  of the car, so there wasn't nobody else running around with

14  the checks and cashing any.

15          And I let them know that because they had a

16  checkbook.  And I think he actually wanted to know where teh

17  checks were, so I discussed it with the State Police.

18      Q.  Can you explain to the Judge your understanding of

19  how the Vermont State Police came to be in possession of the

20  checkbook.

21      A.  Yeah.  I left my car up in Vermont, borrowed a

22  truck to come down to Lackawana County to pick up furniture.

23  Well, the checkbook was in the car.  As I came back to

24  Lackawana County with the truck, I got arrested, hence being

25  the checkbook was still in the car when I got arrested.

9

1      Q.   Was that information passed on -- to your
2  knowledge passed on to the Vermont State Police and then
3  they got the checkbook?
4      A.   Yes.  Yes.
5      Q.   Did you explain to officer Schattauer that you
6  didn't pass anymore checks and that you were incarcerated
7  shortly after the checks were passed in Venango County?
8      A.   Yes.
9      MS. SERVIDIO:  I'm go to object, Your Honor, to leading
10  the Petitioner at this time.
11      THE COURT:  Well, he is.  It's just to get through this
12  quicker, I guess, but be careful about that.  It's
13  sustained.
14      Q.   Did you discuss with Officer Schattauer the
15  approximate time of your arrest?
16      A.   Yes.
17      Q.   Did you explain to him that you did not write any
18  further checks out of the checkbook?
19      A.   About the ones in Venango County, I told him I
20  didn't, yes.
21      Q.   All right.  After you'd been interviewed by the
22  State trooper, Mr. Tanner, and had been interviewed by
23  Officer Schattauer, were you eventually charged in Venango
24  County?
25      A.   Yes.

1      Q.    What happened with regard -- initially, with
2  regard to those charges?
3      A.    What do you mean?
4      Q.    First of all, did you appear in front of a judge
5  at that point the time?
6      A.    Yeah, for like arraignment, for arrest and bail.
7      Q.    And did you have an attorney appointed at that
8  time?
9      A.    No.  There was nobody until a preliminary hearing,
10 I believe, it was.
11     Q.    Okay.
12     A.    And there was some lady, Shelly Hamm.
13     Q.    And did you actually have a preliminary hearing?
14     A.    No.  She waived it.
15     Q.    Were you given copies of the charging documents
16 against you?
17     A.    No.
18     Q.    Okay.  Did you then stay in the Franklin County
19 jail?
20     A.    Just a couple of days and I went back to Camp
21 Hill.
22     Q.    Okay.  This would have been after the arraignment
23 and the preliminary was waived.
24     A.    Uh-huh.
25     Q.    Okay.  Did you stay in Camp Hill?

1        A.    For the time being, and then I transferred to my

2   home prison, which would be Housedale.

3        Q.    Did you ever get brought back to Venango County --

4        A.    Yes.

5        Q.    -- based on these charges?

6        A.    Yes.  For a plea hearing or whatever was going to

7   happen.

8        Q.    Okay.  Where did you -- from Housedale, where did

9   they take you?

10       A.    Venango County jail.

11       Q.    Did you meet with your lawyer at Venango County

12   jail?

13       A.    Yeah, it was somebody different, Hindman.

14       Q.    Had you met him before?

15       A.    No.

16       Q.    Did he come to the jail to speak with you?

17       A.    Yes.

18       Q.    Can you explain how that went.

19       A.    Well, he just came with the plea.  He told me that

20   if I didn't accept a plea, I'd be facing 30 years, 30 years

21   in prison.  He said that my best thing I could do would be

22   to plead guilty to one count forgery, one count theft by

23   deception.  He said that if I pled guilty, he said you're

24   only going to end up with, probably, two and a half, five

25   years that would run concurrent with Lackawana County

1    because it was the same crimes -- or similar charges, he

2    said.  And that was pretty much it.

3        Q.   And how long did the meeting last?

4        A.   A few minutes.  Maybe, 15 at the max, if that.

5        Q.   Were you the only one that he saw while he was

6    there?

7        A.   No.  There was numerous people he seen.

8        Q.   Did he show you the charging documents, the

9    information?

10       A.   No.  The only thing I saw was a docket sheet.

11   That's the most I seen was the docket sheet.

12       Q.   Did you see the docket sheet then or sometime

13   later?

14       A.   Sometime later.

15       Q.   When you were meeting with Mr. Hindman, did he

16   show you a charging document?

17       A.   No.

18       Q.   Did he tell you the dates that the offenses were

19   alleged in the information to have occurred?

20       A.   No.

21       Q.   After meeting with Mr. Hindman, did you agree, or

22   did you and he agree, that he would enter a guilty plea

23   based on the plea agreement that he presented to you?

24       A.   Yes.

25       Q.   Okay.  Did you then subsequently get taken over to

1  the courthouse --

2      A.   Yes.

3      Q.   -- sometime shortly thereafter.

4      A.   Yes.

5      Q.   All right.  Now, when you went to the courthouse,

6  was it just a hearing where it was just you having your

7  hearing or were there a number of different --

8      A.   There were several people there waiting for

9  hearings sitting in the courtroom.

10      Q.   Before you had your hearing in front of a judge,

11  did you and Mr. Hindman have some further discussions about

12  your case?

13      A.   Yes.  He asked me about anymore checks being out

14  there because he had said he didn't want it to come back and

15  affect me later with the plea, and I explained that there

16  wasn't.  And I explained that after July when I cashed that

17  check in Venango County, I said I was arrested and put in

18  jail.  I said there's no way there's anymore checks out

19  there.

20      Q.   Did Mr. Hindman indicate to you that there had

21  been some type of allegation that you had been writing more

22  checks?

23      A.   Yes.  Officer Schattauer spoke to him and he

24  told -- I guess he spoke to Mrs. Reese on August 16th, and

25  she had made the statement that I was cashing her checks

1    until August 6th, and that's where it came from.  And that

2    was impossible.  And that was pretty much the reason for the

3    discussion to show him that after July, I was in jail and it

4    couldn't have been me, nor could anybody have those checks

5    because the Vermont State Police had confiscated them.

6        Q.   And you discussed this with Mr. Hindman.

7        A.   Yes.

8        Q.   I want to make sure it's clear, you said that

9    Schattauer had talked with Reeses.  Is that information that

10   you received through Mr. Hindman or through Mr. Schattauer?

11       A.   Well, I mean through him talking to Mr. Schattauer

12   and talking to him and I received it from Mr. Hindman.

13   Mr. Schattauer didn't tell me that.

14       Q.   Mr. Hindman was explaining what he had learned.

15       A.   Yeah.  He had contact with Officer Schattauer,

16   yes.

17       Q.   Did Mr. Hindman -- what did he explain to you

18   about why he wanted to know about whether there were other

19   checks out there?

20       A.   Because he said if there was and they weren't

21   brought up, it could affect the time I served in jail,

22   possibly the plea agreement, and that's why he wanted to

23   know.

24       Q.   Okay.  Did you tell Mr. Hindman that there were

25   more checks out there or did not tell him that there were

1    not?

2        A.    I told him there were not.

3        Q.    Did you explain to him why you were confident that

4    there were not?

5        A.    Yes.

6        Q.    How did you do that?

7        A.    I explained that the State Police in Vermont

8    confiscated the checkbook from the car.  I explained that I

9    didn't write any between Oil City and Vermont, there were no

10    checks written whatsoever.  But when I was arrested in

11    Lackawana County, the Vermont State Police got the checkbook

12    from the car that was left in Vermont -- because the car was

13    actually wanted in addition, something separate.  So I

14    explained there was no way possible there could be anymore

15    checks out there.

16        Q.    Okay.  And did you or did you not explain to

17    Mr. Hindman that if somebody was trying to say that you

18    wrote checks in August that that couldn't happen?

19        A.    I told him that was impossible for a check to be

20    out there any time after July, any time after it was

21    confiscated.  Unless a State Police officer took a check and

22    wrote a check, there couldn't be anymore checks out there

23    from what I wrote.

24        Q.    After you explained this to Mr. Hindman, did he

25    question you anymore about dates or advise -- did he give

1    you any further advice on whether or not you should accept a

2    guilty plea?

3        A.    No.

4        Q.    Did you go forward with the guilty plea?

5        A.    Yes.

6        Q.    Okay.  As you were pleading guilty in front of the

7    judge, I believe it was Judge White, did you have -- as you

8    were entering -- going through that plea process, did you

9    have the charging documents in front of you?

10       A.    No.  I had the docket statement.  That's the only

11   thing I ever seen throughout the whole procedure.

12       Q.    Did you have the plea agreement in front of you?

13       A.    No.  Mr. Hindman did.

14       Q.    Okay.  Prior to you starting the change of plea

15   proceeding, had you gone over the plea agreement with

16   Mr. Hindman and you signed it?

17       A.    Yes.

18       Q.    During the course of your plea, when you were

19   pleading guilty, did you pay particular attention to the

20   dates that the Judge explained the offenses had occurred on?

21       A.    No.  No.

22       Q.    Okay.  How long had you met with Mr. Hindman in

23   total?

24       A.    15 minutes, 20 minutes.

25       Q.    At any point did Mr. Hindman ask for a pause in

1    the proceedings and discuss with you about the fact that the

2    charging documents were -- at least with regard to the theft

3    by deception charge you were pleading guilty to --

4    indicating that offense happened in August?

5        A.    No.

6        Q.    After you had your discussion with him about the

7    Reeses' claim that you had continued to write checks and you

8    had explained that, no, you hadn't and the circumstances as

9    to why you knew you couldn't, did Mr. Hindman ever raise an

10   issue with you about any problems with the dates of the

11   offenses alleged in the information with regard to the

12   dates you were -- the information you had just given him?

13       A.    No.

14       Q.    As you were standing in front of the Judge and

15   pleading guilty, did you realize that on the theft by

16   deception charge there was a claim that that offense

17   occurred on August 6, 1997?

18       A.    I didn't pay attention to it then, I was scared of

19   a 30-year sentence.  I didn't even -- I guess it went in one

20   ear and out the other as to what was said there.

21       Q.    If it had been explained to you by your lawyer

22   that the charges -- the theft by deception charge was

23   alleged to have occurred on August 6, 1997, and also

24   explained to you by your lawyer that based on your

25   explanation as to how you knew you hadn't written any checks

1  in August, namely, that you had been incarcerated, would you

2  have gone forward with a guilty plea to the theft by

3  deception charge?

4      A.   No, I wouldn't have.

5      Q.   Why?

6      A.   Because there's no way I could have committed any

7  crime after July 19, 1997.  It was impossible.

8      Q.   Now, even after you pled guilty, was there some

9  discussion with the Judge about you getting sent back to

10  Housedale and that you had been incarcerated and were

11  incarcerated?

12     A.   Yeah.  It was stated that I was incarcerated from

13  such and such a time during my sentencing, and I had to go

14  back to Housedale to finish out the sentences for both

15  Venango and Lackawana Counties.

16     Q.   Between the time that you pled guilty in Venango

17  County --

18     A.   Right.

19     Q.   -- and the time you were sentenced in Venango

20  County --

21     A.   Uh-huh.

22     Q.   -- were you ever shown the charging document?

23     A.   No.

24     Q.   Did Mr. Hindman ever talk to you about the fact

25  that the charging document, with respect to the theft by

1    deception charge, claimed that the offense happened on

2    August 6th of 1997 and the fact that you had informed him

3    that you had been incarcerated on that day?

4         A.    Nothing ever came up about it and neither did the

5    plea agreement.  I mean, the plea doesn't even show.

6         Q.    After you were sentenced, did you ask Mr. Hindman

7    to file an appeal?

8         A.    Yes.  I attempted to on numerous occasions.

9         Q.    Was one ever filed on your behalf by Mr. Hindman?

10        A.    No.  I never heard from him after that date.

11        Q.    Would it be fair to say that after that date, you

12   have filed a number of various types of pleadings in Venango

13   County and in Superior Court and with the Pennsylvania

14   Supreme Court to try and litigate many different issues in

15   your case?

16        A.    Yes.

17        Q.    When was the first time that you received actual

18   paperwork from Venango County about your case where you were

19   able to look at it and you realized, hey, wait a minute,

20   this says I committed this theft by deception charge on

21   August 6, 1997?

22        A.    I believe it was in 2005.  From the beginning, I

23   tried to get records but I guess because Mr. Hindman was

24   still counsel of record, I was not entitled to these records

25   unless it came from him.  Because he never filed a motion to

1    withdraw himself as counsel, I was kind of stuck.  So I

2    guess it was after I left or something, I don't know, but he

3    left Venango County.  And because he left, it wasn't until

4    2005 where I seen the document showing the crime occurring

5    August 6, 1997.

6        Q.    Where did you get that paperwork from?

7        A.    Venango County Courthouse.

8        Q.    They finally sent it to you.

9        A.    Yes.

10       Q.    Up until that time you were having trouble getting

11   stuff because they considered you still to be represented by

12   counsel.

13       A.    I don't know what they considered.  Attorney

14   Hindman was no longer there.  But according to the record,

15   he was still counsel of record because he never filed a

16   waiver and a motion to leave.  I requested them -- and I

17   don't know what happened to them, I tried to file for a

18   hearing.  I don't know if they went to him, or were

19   dismissed, or whatever.

20       Q.    After you received the document statement in 2005

21   and you saw the August 6, 1997 date on the theft by

22   deception charge, did you attempt to raise the issue

23   regarding that date and the fact you were incarcerated on

24   that date in Venango County?

25       A.    Yes.

1      Q.    And did you attempt to litigate that issue in the

2  State Court?

3      A.    It was an attempt.

4      Q.    Okay.  Now, at the time that you pled guilty, if

5  your attorney had sat you down and showed you the charging

6  documents for the theft by deception charge, shown you that

7  it was alleged that the theft by deception occurred on

8  August 6, 1997, and talked to you about the fact that you

9  had just told him, your attorney, that you had been -- you

10 didn't write any checks in August because you were

11 incarcerated, and he explained to you that there was an

12 inconsistency there, would you have pled guilty to the theft

13 by deception charge?

14     A.    No.

15     Q.    What would you have done on the theft by deception

16 charge?

17     A.    I would have taken it to trial.

18     MR. PATTON:  Those are my questions, Your Honor.

19     THE COURT:  Cross examination, Ms. Servidio.

20

21                     CROSS-EXAMINATION

22 BY MS. SERVIDIO:

23

24     Q.    Good morning, Mr. McNatt.

25     A.    Good morning.

1      Q.   You say you spoke to Shelly Hamm, correct?

2      A.   Yeah, one time at the preliminary or something.

3      Q.   And you never spoke with her after the preliminary

4  hearing.

5      A.   No.

6      Q.   And then Mr. Hindman came into the picture, right?

7      A.   Yes.

8      Q.   And that was on the day of the guilty plea, right?

9      A.   I met him, I think, a day before in the County

10 jail.  He came over to the County jail and said he took over

11 Shelly Hamm's case load, I guess.

12     Q.   And he spoke with you about how the sentences run

13 consecutively and concurrently, and you discussed what

14 happened in Lackawana, too, correct?

15     A.   Well, he didn't talk about consecutive or

16 concurrent.  We were just talking about pleading guilty to

17 these two crimes, that they would run them concurrent with

18 Lackawana County because it's the same criminal -- you know,

19 the same crime.  He didn't say nothing about consecutive.

20     Q.   Now, you stated to Mr. Patton that they would

21 probably be concurrent, but he didn't say that they would

22 definitely run concurrent, right?

23     A.   Well, he didn't say definitely.

24     Q.   So you understood there was a possibility, then,

25 that they could run consecutively, correct?

1       A.    Yeah.

2       Q.    And did you sign the plea agreement at that point

3  in time, or did you sign a plea agreement at the time of the

4  plea colloquy?

5       A.    No, before the colloquy.

6       Q.    And the plea, itself, indicates -- does not

7  indicate at all whether it's to run consecutive or

8  concurrent, correct?

9       A.    No.

10      Q.    It's just that nine of the charges on what would

11  be Venango County's 183 of 1998 would be nol prossed and you

12  would be doing a guilty plea to only one count, Count 5,

13  correct?

14      A.    (Witness nods head.)

15      Q.    And also the other statement in there, as much as

16  you can recall, is that restitution would be made on all

17  five checks, correct?

18      A.    Yes.

19      Q.    That was both with regard to 182 of 1998 and 183

20  of 1998, correct?

21      A.    Yes.

22      Q.    And 182 was the forgery, correct?

23      A.    Yes.

24      Q.    But, again, nowhere is there a concern of

25  consecutive sentence stated in your plea agreement, right?

1      A.   Not that I know of, no.

2      Q.   At the time of the guilty plea, which was

3   September 15th of 1998, right?  Do you remember the date?

4      A.   I thought it was October 20th I got sentenced.

5      Q.   You were sentenced on October 20th, right?

6      A.   I believe so.

7      Q.   That wasn't the same day as the guilty plea.

8      A.   No.

9      Q.   And you stated that there was no information in

10  front of you, right?

11     A.   The most I seen was a document statement.  I seen

12  nothing else.

13     Q.   Okay.  So you don't -- you have no knowledge that

14  pleas do not proceed unless informations are in front of the

15  defendant, right?

16     A.   No idea.

17     Q.   You can't remember exactly what was stated at the

18  plea colloquy; can you?

19     A.   Some.  I mean, I read it.

20     Q.   You did read the plea colloquy?

21     A.   Yes.  I mean, I have one now.

22     Q.   Do we have one here?

23     MS. SERVIDIO:  May I approach, Your Honor?

24     THE COURT:  Yes.

25     MR. PATTON:  When we were here last time, Your Honor, I

1    was reading the transcript at the last time and we moved the

2    transcript of the plea into the record at the last hearing

3    we had.

4        THE COURT:  Right.  And it was also attached to

5    something.  It was attached to -- I don't remember what it's

6    attached to.

7        MR. PATTON:  It wasn't in with the initial stuff, but

8    it's in the record, Your Honor.

9        THE COURT:  I have it right here, September 15th.

10   BY MS. SERVIDIO:

11       Q.   On Page 12 -- I'll hand this to you -- Line 18,

12   the Court states, "Okay.  Mr. Hindman, do you have the

13   information there?"  And Mr. Hindman responds, "I do, Your

14   Honor," which indicates the information was, in fact, in

15   front of you.

16       A.   I don't know.  I didn't see it.

17       Q.   So you're stating you didn't see it in front of

18   you.

19       A.   I didn't see anything anywhere.

20       THE COURT:  What page is that, I'm sorry?

21       MS. SERVIDIO:  Page 12, Line 18.

22       Q.   Do you agree that the information alleges that on

23   or about August is when these crimes were to have occurred?

24       A.   I do now.

25       Q.   Well, according to the transcript we have here,

1  the information was in front of you, and Count 5 alleged

2  that the checks were passed in July of 1997.

3      A.   What was in front of me was a docket showing Count

4  5 on theft by deception being used against me.  And it's

5  actually listed on the docket statement on Count 5, it says

6  M1 theft by deception, which was held against me.

7      Q.   Within the plea colloquy, itself, you did

8  reference the fact that you made these purchases at

9  Riverside Market, I believe, is the name of the place, for

10  money and groceries, correct?

11      A.   Merchandise and whatever, yeah.  For the checks I

12  wrote, yes.

13      Q.   And so you're not disagreeing with the fact that

14  the checks that you passed, you did pass and they were theft

15  by deception.

16      A.   Yes.

17      Q.   In fact, in your PCR amendment that you filed on,

18  I think, July 20th of 2004, you admit that all of the checks

19  that you passed were what you considered theft by deception,

20  correct?

21      A.   What do you mean that I considered theft by

22  deception?

23      Q.   You admitted that they were -- in fact, you passed

24  the checks to deceive the person and that, in fact, it was

25  theft by deception, the ones that you passed in Venango

1    County.

2         A.   Yes.

3         Q.   Now, the information says on or about August 6th,

4    correct?

5         A.   I guess it does.

6         Q.   So that's a general idea, it doesn't mean that it

7    is August 6th, but on or about August 6th, correct?

8         A.   Well, that's kind of deceiving.

9         Q.   Well --

10        A.   I'm just -- it is if -- I didn't know the exact

11   date.  I mean, it's the essential element of the crime.

12        Q.   Well, on Count 5 with the information that was in

13   front of you, according to the transcript, Count 5 states

14   specific dates that the checks were passed, and that's not

15   as deceiving, right?

16        A.   True.

17        Q.   And those were four checks, correct?

18        A.   I guess.  If you're talking about both, I don't

19   know.  I mean, I thought there was 14.

20        Q.   So you're saying that you wrote additional checks,

21   other than these four checks?

22        A.   No.  I'm saying that I saw the docket which was

23   showing 12 to 14 counts of bad checks.  I never knew there

24   was a forgery charge on the second one.

25        Q.   So you're saying you didn't understand that on 182

1  of 1998 there was a forgery charge?

2       A.    No, 183-1998.

3       Q.    The counts that were nol prossed.

4       A.    I have no idea.  I'm saying I saw the docket

5  statement.  The docket statement says 24 counts of a the and

6  none of them being a forgery.  I was not aware there was a

7  forgery charge on that case until after I received the

8  information.

9       Q.    Is it possible it's because the forgery counts,

10  themselves, are on the second page of the information and

11  you merely had the first page of the information in front of

12  you?

13       A.    I can guarantee it.  I mean, I didn't have the

14  information, I had a docket statement.  And it says nowhere

15  on the docket statement that I had the information sheet.

16  And every time I wrote to the courts, they sent me the same

17  thing.

18       Q.    Okay.  The checks that you passed in Lackawana

19  County, you'd agree that they were not the checks that were

20  passed or you were charged with in Venango County, correct?

21       A.    Well, from the same checkbook.

22       Q.    Same checkbook, but not the same checks.

23       A.    No.

24       Q.    For example, the car that you purchased with the

25  one check in Lackawana County, it wasn't charged in Venango

1    County, correct?

2        A.    I hope not.

3        Q.    Okay.  Do you recall how in depth the plea

4    colloquy, itself, was?

5        A.    Yeah, pretty much.  I mean, not word for word,

6    but.

7        Q.    For example, the Judge discussed where you were

8    currently at in the State Prison system, right, your

9    address?

10        A.    Yeah, Housedale.  Yeah.

11        Q.    And, for example, he asked you about medications,

12    too?

13        MR. PATTON:  Edward, you have to answer out loud.

14        A.    Yes.

15        Q.    Do you recall your response to the type of

16    medication that you were using?

17        A.    Well, I know what I was on back then.  The record

18    says no.

19        Q.    So you stated that you were not on medication and

20    you actually were.

21        A.    No.  I'm saying that when I read the colloquy, it

22    stated no for using medication, but I knew I was on

23    medication.  I was on psychotropic medication for a bipolar

24    disorder.  And Venango County was giving me -- while I was

25    down there, they were giving me part of the medicine that

1    was prescribed.

2        Q.   So you don't really know why you responded no.

3        A.   I didn't respond no.

4        Q.   So the plea is -- or the transcript, itself, of

5    the plea isn't correct in regard to that respect, too.

6        A.   Well, it had to be because I was on medication.

7    Venango County was giving me the medications.  I think he

8    asked me if I was on any kind of medication that would

9    affect my judgment and I said no.

10       Q.   Can you refer to Page 12.

11       A.   (Witness complies.)

12       Q.   Line 3.

13       A.   Uh-huh.  He asked me if I had illegal drugs.

14       Q.   And then the Court, in Line 7, says, "Any

15    medications?"  And you said, "No."

16       A.   Okay.

17       Q.   So is it your testimony that you stated that you

18    actually did -- at the time of the plea colloquy, you told

19    the Court you were on medication.

20       A.   Yes.

21       Q.   Okay.  So I understand, the information wasn't in

22    front of you and you told the Court that you were on

23    medication, but the plea colloquy reflects otherwise, right?

24       A.   I guess.

25       MS. SERVIDIO:  I don't have any more questions.  Thank

```
 1    you, Your Honor.

 2         THE COURT:  Redirect?

 3

 4                         REDIRECT EXAMINATION

 5    BY MR. PATTON:

 6

 7         Q.   Edward, keep looking at Page 12 of the transcript.

 8    You were asked questions about what it indicated about the

 9    information.  On Line 18, it says, "Okay.  Mr. Hindman you

10    have the information there."  Do you see that?

11         A.   Yes.

12         Q.   Did Mr. Hindman says, "I do, Your Honor."

13         A.   Yes.

14         Q.   Anywhere onto the end of Page 12 or onto Page 13,

15    do you ever indicate that you have it in front of you?

16         A.   No.

17         Q.   Did you have any of the informations in front of

18    you?

19         A.   No.

20         MR. PATTON:  I have no more questions, Your Honor.

21         THE COURT:  Ms. Servidio?

22         MS. SERVIDIO:  May I, Your Honor?

23         THE COURT:  Yes, you may.

24

25                         RECROSS-EXAMINATION
```

1    BY MS. SERVIDIO:

2

3        Q.   When you were in the courtroom, were you seated at

4    the time of the plea?

5        A.   No. I was standing at the bench.

6        Q.   And who was standing next to you?

7        A.   On my left was Mr. Hindman on my right was the

8    District Attorney.

9        Q.   Okay.  So when Mr. Hindman stated that he had it

10   in front of him, it was in front of both of you, right?

11       A.   I didn't see nothing.  Nothing was in front of me.

12   I saw nothing.

13       MS. SERVIDIO:  Okay.  Nothing further, Your Honor.

14       THE COURT:  All right.  You may step down, Mr. McNatt.

15   Thank you.

16       MR. PATTON:  Your Honor, we have no further evidence to

17   present.  I'm not sure if the Commonwealth has any.

18       THE COURT:  All right.  We'll ask, does the

19   Commonwealth have any evidence?

20       MS. SERVIDIO:  No, Your Honor, just argument.

21       THE COURT:  Then we will take argument.

22       MR. PATTON:  Your Honor, when we were here last time,

23   we talked about the issue and the fact that Mr. McNatt has

24   filed his habeas petition pro se, and indeed filed it as a

25   1983 matter.  And Your Honor changed it -- or converted it

1    to a 2254.  It has to be construed liberally because it's

2    filed pro se.  And that we believe that while he labeled

3    some of the claims a due process claim, that when he laid

4    out the claim about pleading guilty to the offense that on

5    the date that he was incarcerated that that, I believe, read

6    liberally as an ineffective assistance of counsel claim.

7    Because the way he presented it -- he presented a separate

8    due process claim that the plea was knowing and intelligent,

9    but he also claimed that his counsel was ineffective for

10   allowing him to plead guilty to this offense.

11       If I could, Your Honor, I did have another piece of

12   evidence, and I apologize that I forgot, it's the paperwork

13   from the Lackawana County jail showing that Edward was at

14   that Lackawana jail --

15       THE COURT:  Is that the only thing --

16       MR. PATTON:  I believe that is, Your Honor.

17       THE COURT:  All right.

18       MR. PATTON:  And I don't believe that's contested --

19   it's not, so I'm sorry, I just wanted to make sure of that.

20       When Edward was charged with these offenses in Venango

21   County, he asked for counsel, asked for the assistance of

22   counsel, which, of course, he has the right to, and he was

23   appointed counsel and that counsel, obviously, has to be

24   effective.

25       As Edward explained to, when he met with Mr. Hindman

1    and spoke with Mr. Hindman before the change of plea when

2    Mr. Hindman was asking Edward about whether or not out there

3    were other checks out there because if there were claims by

4    the Reeses, who owned the checkbook, that other checks had

5    been written in August, that Edward explained that there are

6    no checks, there are no more checks.

7         And I would submit that Mr. Hindman at that point in

8    time is doing the right thing, trying to make sure there

9    aren't other checks hanging out there.  Because I assume if

10   they would have discovered that there were other checks out

11   there, they would have tried to get them all tied into that

12   plea so that there -- he doesn't go ahead with the plea that

13   they have scheduled and then later other checks come up and

14   he's facing other charges.

15        So I think it's entirely appropriate for Mr. Hindman to

16   be checking to make sure there aren't other checks out

17   there, especially if Mr. Hindman has been approached by the

18   Oil City detective who was handling the case and was told

19   that there were some indications from the victims that there

20   were further checks out there.

21        But once Edward explained to Mr. Hindman that there

22   weren't more checks out there and explained to Mr. Hindman

23   why it was Edward could be confident that there were no more

24   checks out there, well, now Mr. Hindman has the information,

25   all the information, he needs to figure out that Edward did

1    not commit an offense of theft by deception on August 6th of

2    1997 because he was incarcerated.

3         Now, whether the date is called on or about August 6,

4    1997 or not, I would submit to you this does not mean that

5    it is all right for there to be this discrepancy between the

6    dates that the charges were supposedly passed -- or the

7    checks were supposedly passed and the date the offense was

8    alleged to have occurred.  Because the -- while the

9    Pennsylvania courts allow for the amendment of

10   informations --

11        THE COURT:  For mistaken dates.

12        MR. PATTON:  -- for mistaken dates, the -- they have

13   also found -- and this is a Superior -- a Supreme Court,

14   Commonwealth versus Devlin, which is 460 Pa. 508 333 A.2d

15   888, they talk about being able to -- having to prove up the

16   offense occurred on a particular date.

17        They quote one of their prior cases, Commonwealth

18   versus Leden 146 Pa. Super 564 23 A.2d (1997), it's from

19   1941 but it's still the law, that it may be conceded that in

20   the event of crimes of the kind here involved, the

21   Commonwealth is not required to prove information on the

22   date laid out in the information, but failing in that, we

23   think it has the burden in order to sustain a conviction of

24   proving the commission upon some other date fixed with

25   reasonable certainty and being within the required statutory

1    period.

2         In other words, where a particular date or day of the

3    week is not of the essence of the offense, the date laid in

4    the information is not controlling, but some other

5    reasonably definite date must be established with sufficient

6    particularity to advise the jury and the defendant to the

7    time the Commonwealth alleges the offense was actually

8    committed and to enable the defendant to know what dates and

9    period of time he must cover if his defense is an alibi.

10        THE COURT:  Doesn't that count when there's a trial?

11   What about with a plea?  What kind of burden do they have

12   with a plea if --

13        MR. PATTON:  The reason that the date is important is,

14   as the Supreme Court said, the defendant has to be on notice

15   of when there's -- the Commonwealth is saying the offenses

16   occurred because if they want to use an alibi defense --

17   because if you're going to prepare an alibi defense, you,

18   obviously, have to know what dates the Commonwealth is

19   saying you committed the crime.

20        THE COURT:  He was standing right there, and in the

21   transcript they said August 6, 1997.

22        MR. PATTON:  Okay.  Your Honor, you're at a change of

23   plea that's occurring in a crowded courtroom where there's

24   multiple cases that are going on, all right?  Not at the

25   same time, I'm not saying -- but, you know --

1        THE COURT:  Where they bring them all in, they tell

2    them the initial stuff, and they then go on.

3        MR. PATTON:  Right.  Mr. McNatt has an attorney there

4    that he has asked for that's been appointed to represent

5    him.  As far as McNatt knows, he's there to plead guilty.

6    He has not been shown his testimony, he has not been shown

7    the information.  If you look at the transcript -- even on

8    Page 12 of the transcript that Edward was asked about, the

9    Court asked Mr. Hindman if Mr. Hindman had a copy of the

10   information, singular, not informations plural, and

11   Mr. Hindman said that he does.

12       That doesn't mean that there's any evidence in the

13   record that Mr. Hindman showed those to Edward, or Edward

14   had them in front of him, or that Mr. Hindman had both

15   informations, because these were separate informations.  And

16   the Commonwealth hasn't presented any evidence to contradict

17   Edward's testimony that when he was standing in front of the

18   Judge, he was not shown the informations, did not have them

19   in front of him so he could read along.  That's the

20   evidence.

21       So you have a defendant who has met with his attorney,

22   his attorney has given him the advice that he should to

23   enter a plea to a forgery count and a theft by deception

24   count.  Edward has given that attorney the information the

25   attorney needs to recognize and realize that as the offenses

1   charged, Edward is not guilty.

2         It is not incumbent on Edward alone to, in the middle

3   of his plea where he's been told, all right, advised to take

4   the plea offer and told go ahead and do it, for him to in

5   the middle of it -- for the first time, he's never been told

6   the day before, to hear the date and be able to say, wait a

7   minute, stop, let's not go forward.

8         THE COURT:  So this is different than the guilty pleas

9   that I have in front of me every day in habeas where they

10  say, you know, I was told I was going to get this sentence

11  and when I was in there they said, you know, you're not

12  going to be promised a sentence.  I wasn't paying attention

13  to that, I was paying attention to what the attorney had

14  told me before.

15        I get those all the time.  I wasn't paying attention, I

16  was told that if I did plead on this I'd have a better

17  sentence and that's what I meant.  It's different because

18  this is something the attorney should have --

19        MR. PATTON:  Yes.  There's a reason defendants have

20  attorneys appointed to represent them.  The attorneys are

21  supposed to be trained and knowledgeable about how the facts

22  their clients give them --

23        THE COURT:  And now they're required to investigate.

24        MR. PATTON:  Correct.  And they're required to take the

25  facts that their client gives them, evaluate them, if

1    necessary investigate further, and to be able to determine

2    if based on the facts the client has given them, there's a

3    defense to the charge.

4        It is not incumbent on the defendant to do that.

5    That's why he's asked to have an attorney.  If Edward had

6    said, I want to go pro se and represent myself, he would

7    have a much weaker claim.

8        THE COURT:  I know that.  But I know that the courts

9    and the Government have tried all different things to make

10   what happens in the plea have it stick without that

11   argument.  I mean, they now have you sign the colloquy.

12   They now, as Ms. Servidio said, require the information to

13   be in front of you.  They have it on the record.  They ask

14   you do you understand.  They -- the whole colloquy is meant

15   to make that plea appeal proof from the inmate having

16   buyer's remorse five days or two years down the road and

17   saying, you know, I didn't really get that.

18       MR. PATTON:  There's a couple of things on that.  First

19   of all, no matter how hard we try, nothing is ever going to

20   be foolproof.  We're human, and that's not unique to the

21   legal system.  That's why any endeavor that humans are

22   engaged in are subject to human error.

23       But secondly, it is not something where you say, oh,

24   it's just buyer's remorse, it's something you're making up.

25   You have documentary proof in front of you that Mr. McNatt

1    was locked up in the Lackawana County jail on August 6,

2    1997.  This isn't something that you ought to take his word

3    for, that I don't know if he's telling the truth or not.  He

4    was there, there's no dispute that he was there.

5        THE COURT:  Were the checks part of the record?

6        MR. PATTON:  No.  And as far as the checks going in the

7    information, it has for Counts -- this is for 183 of 1997

8    (sic).  It has the checks listed out, it has the dates of

9    the checks, but the offense of passing the bad checks occurs

10   when you pass the check.  And passing the check doesn't have

11   to be the same date that the checks are dated.  You can pass

12   a check that's dated on July 12, 1997 on August 6th of 1997,

13   and if you do that, the crime occurs on August 6, 1997.

14       So simply because the checks have that date on them,

15   doesn't mean that that's an allegation that that's the date

16   the offense occurred.  Indeed, the information charges that

17   Counts 1 through 4, which are the actual passing of the bad

18   checks, it says those crimes are alleged to have occurred on

19   August 6, 1997.  It's the passing of the check that's the

20   crime, not the date that is on the check.

21       THE COURT:  And that brings a whole new thing, but I

22   want to go back to my thinking earlier.  The difference

23   I'm -- I'm wondering if this is a distinction with a

24   difference that a case where someone claims their plea is no

25   good because their attorney didn't explain something to them

41

1    that is was within the attorney's expertise versus my plea

2    is no good because I wasn't listening to the dates.  That's

3    not a legal issue that he wouldn't understand himself.

4        MR. PATTON:  There is a difference, Your Honor, between

5    saying, well, I was answering the Judge's questions but I

6    didn't really -- I didn't understand them.

7        THE COURT:  Which I was relying on my attorney, that's

8    what they always say to me.

9        MR. PATTON:  But there's a difference when you say,

10   look, I gave my attorney all the information, the factual

11   information that that attorney needed to have to determine

12   that I did not commit this offense as charged.  My attorney

13   never says to me, hey, you couldn't have done this,

14   committed this offense as charged, don't plead guilty to

15   this because you didn't do this.

16       He didn't even go into, well, maybe the dates are

17   wrong, but they could have -- you know, maybe if we raise

18   it, maybe they can amend it and we'll be back in the same

19   position.  So if you want to, I can raise it, but they can

20   fix it if they want to so we might as well go ahead.

21       THE COURT:  I actually did think that he was going to

22   say that.

23       MR. PATTON:  Who?

24       THE COURT:  The Petitioner.  I thought that that was

25   going to be the factual basis here that the attorney would

1  have said to him, it will just change the date and you'll

2  still be charged with the crime --

3        MR. PATTON:  His attorney never told him that.

4        THE COURT:  -- but that's not the case.

5        MR. PATTON:  So when you -- as a defendant, a

6  layperson, you laid out the facts for your attorney and your

7  attorney still tells you, do this plea, this is what's in

8  your best interest, you know.  In my professional opinion,

9  then it is not, I would submit, proper to then tell the

10  defendant, well, the Judge read the date to you and you

11  didn't stop him and say you were not going to plead guilty,

12  therefore, you didn't get the effect of assistance of

13  counsel because you didn't catch this, is not proper because

14  the whole reason he got an attorney is that it's his

15  attorney's job to catch that stuff.

16        Edward's responsibility is to give the information to

17  the attorney so that -- because his attorney can't be held

18  responsible for something that his attorney doesn't know

19  unless the attorney had reason to investigate and find it

20  out.  But the evidence is --

21        THE COURT:  That he gave it.

22        MR. PATTON:  -- that he gave it to him.  And once

23  Edward gives this information to the attorney, it is the

24  attorney's job to say, hold up for a minute, you're telling

25  me that you were in the Lackawana County jail in August of

1    '97, this is a guilty plea for a theft by deception offense

2    that supposedly occurred on August 6, 1997.  At a minimum,

3    then, let me figure this out.  At a minimum, doing some

4    further investigation and coming back to Edward and saying

5    here's your options.  But that wasn't done, so that is

6    ineffective assistance.  And the ineffectiveness makes the

7    plea not knowing and voluntary and to show prejudice under

8    Hill versus Lockhart in the change of plea context.

9        Edward simply has to show that had the attorney's

10   representation not fell below an objective standard of

11   reasonableness, Edward would not have plead guilty.  And

12   that's what the testimony is.  And, Your Honor, I would

13   submit that you cannot engage in the speculation that, well,

14   had his attorney acted reasonably and followed up on this

15   discrepancy in the date, that all that happened was they

16   would have amended -- we don't know that, that's pure

17   speculation.

18       Part of what you do as an attorney is -- as a defense

19   attorney, you make sure the prosecution is doing it right

20   because if you can find a way that they're not doing it

21   right, that can be a defense for your client.  That's your

22   job is to make the Government do it right every time.  And

23   if you don't do that, you're not doing your job.  Or at a

24   minimum, you have to explain to the client and say, hey,

25   they messed this up.  If you want to, I can raise it, but

1  this is likely what's going to happen and we may end up

2  being here.  So the client can make a decision as to whether

3  they want to go forward.

4      But I would submit to you that you can't here speculate

5  as to, well, if this would have been raised, this is what

6  the Commonwealth would have done.  I submit that that's not

7  proper.

8      THE COURT:  I typically have testimony from the

9  attorney.  Did you try to -- is he --

10     MR. PATTON:  My burden is to put on the evidence that

11  supports our claim.

12     THE COURT:  You haven't spoken to him, yourself.

13     MR. PATTON:  I have.  And his response is I don't

14  remember anything about this case.  Mr. Hindman is in

15  Clarion right now and he practices in Clarion County.  He --

16     THE COURT:  And it was 10 years ago.

17     MR. PATTON:  Right.  I explained it to him and he said

18  this would have been almost immediately after he got out of

19  law school.  Because when I first told him the dates, he

20  said that can't be possible because I wasn't even practicing

21  then.  But then when got the exact date hammered out, he's

22  like, yeah, I would have just been out.

23     He asked -- he said, well, maybe if I can review the

24  file, maybe there's some notes in there that would jog my

25  memory.  I contacted the Venango County Public Defender's

1    office and they informed me that they would no longer have

2    the file due to its age.

3        THE COURT:  That is typically what happens, you review

4    the file.  All right.  Thank you very much, Mr. Patton.  Ms.

5    Servidio.

6        MS. SERVIDIO:  Thank you, Your Honor.  I am having some

7    problems understanding that a miscarriage of justice took

8    place in this case.  As far as notice that's required on the

9    information, the notice was within the information, itself,

10   as to Count 5, which makes the specific date that we're

11   talking about, August 6th, not a material variance on the

12   information, but rather an immaterial variance.

13       The Court, itself, states specifically in the plea

14   colloquy that he was admitting to the charges as they were

15   charged.  And the Count 5, itself, specifically gives the

16   days of the checks.  Mr. McNatt made admissions to the

17   checks, themselves, so we're getting into the

18   involuntariness right now or whether or not he intelligently

19   and understandingly went through with the guilty plea,

20   itself.

21       To address that, are we arguing here today that it was

22   completely involuntary then when it states what he had

23   stated?

24       THE COURT:  I agree with you on that.  That's why I

25   said to Mr. Patton, I hear that every day.

1        MS. SERVIDIO:  We have the information in front of him,

2   he stated that Mr. Hindman was next to him looking,

3   apparently, he's looking straight ahead, that's what we're

4   to believe, that he doesn't see the information as it's laid

5   out.  We do not proceed without that information in front.

6        The factual basis, itself, he indicated how these

7   things were taken place.  And as far as the specific date of

8   August 6th, it's on or about.  I can't stress that enough.

9   That doesn't mean August 6th of 1997.

10       THE COURT:  Are checks like that usually made part of

11  the record?

12       MS. SERVIDIO:  We don't --

13       THE COURT:  Unless there's a trial.

14       MS. SERVIDIO:  That's correct, Your Honor.

15       THE COURT:  I understand.

16       MS. SERVIDIO:  But they are laid out, precisely, within

17  Count 5, itself.  In addition, Mr. Hindman had nine counts

18  nol pros in this case.  I would say that -- I would argue

19  that he was not ineffective.  This man faced a serious

20  amount of charges, a serious amount of time in this case.

21       THE COURT:  So you're saying that the plea agreement

22  that he worked out was a particularly good one.

23       MS. SERVIDIO:  It was excellent.  There's one count of

24  the theft by deception, misdemeanor of the first degree, and

25  the only agreement is to pay the restitution on both 183 and

1    182 of 1998, and these other counts were nol pros.

2         And he made admissions to that.  So I'm certain that

3    Mr. Hindman believed that this was an excellent opportunity

4    for Mr. McNatt to take here, when he was facing so much

5    time.

6         And additionally, I would state that the plea

7    agreement, itself, doesn't mention whether it will run

8    concurrent or consecutive.  And as Mr. McNatt stated on the

9    stand, he said it would probably run concurrent.  Now, he

10   didn't say it would run concurrent, but when he was

11   questioned by Mr. Patton, he said it would probably run

12   concurrent.  So he did understand the consecutive and

13   concurrent nature of the charges, as well.

14        So I think Mr. McNatt is leading us to believe that he

15   really didn't have an understanding when, in fact, he did.

16   And I would question his voracity with regard to when he

17   stated that he made -- he mentioned medications that he was

18   taking, and yet it's not reflected in the plea colloquy.

19   And I'm certain it's not left out in the transcript.

20        THE COURT:  Yes.  I have that marked, it's on Page 12

21   as well.

22        MS. SERVIDIO:  So Mr. Patton sited in his brief,

23   itself, as far as for showing that there's new evidence

24   here, there's no new evidence other than now that he's

25   admitting to the offenses.  And we have to look at it as

1    whether a jury would find beyond a reasonable doubt.

2         THE COURT:  Well, let me ask you this question:  How do

3    you respond to his comment that he doesn't now have to worry

4    about that anymore because the Commonwealth didn't respond

5    to his brief on miscarriage of justice, so we are here for

6    the --

7         MS. SERVIDIO:  The Commonwealth responded in the

8    motion -- in response to his motion to reconsider.  The

9    Commonwealth would note that his motion to reconsider, he

10   cut and pasted it into his brief, it's almost precisely the

11   same.  The Commonwealth could have cut and pasted her

12   response to motion to reconsider and made that her brief,

13   too.

14        So I would argue that my motion to reconsider,

15   everything that's in that brief, itself, I would argue here

16   today.

17        THE COURT:  Okay.

18        MS. SERVIDIO:  I would argue, Your Honor, that we're

19   looking at a hyper-technical issue here of the specific date

20   of the 6th of August of 1997 on the information.  And it's

21   certainly not a miscarriage of justice or -- nor has he

22   demonstrated ineffectiveness of counsel given what counsel

23   worked out for him at that time.

24        And by his statement and his understanding of

25   concurrent and consecutive sentences, and the fact that the

1  colloquy does state that informations were in front of him,

2  while he states they weren't.

3       And the ineffectiveness claims, themselves, could have

4  been addressed and were to be addressed pursuant to the

5  Superior Court order remanding it to the State Court and

6  then to County Court and would have been addressed there,

7  however, Petitioner requested dismissal of it at that point

8  in time.

9       So we really don't have a record of any type of issue

10  with regard to the specifics of the ineffectiveness of

11  counsel claims here.

12       THE COURT:  And just to make sure I have this right,

13  everything was nol pros, except for County 5, theft by

14  deception, which you agree with Mr. Patton, occurs when the

15  checks are passed.

16       MS. SERVIDIO:  Yes, Your Honor.

17       THE COURT:  Okay.  And Count 6, was it -- there are two

18  counts.

19       MR. PATTON:  Counts 1 through 4 and Counts 6 through 10

20  were nol pros from 183 of '97. from 182 of '97, he plead

21  guilty to Count 1, and Count 2 and 3 were nol pros.

22       THE COURT:  And Count 1 of -- not 183, but the other

23  one.

24       MR. PATTON:  Correct.

25       THE COURT:  And that was also theft by deception.

1          MR. MCNATT:  Forgery.

2          THE COURT:  That was forgery.

3          MS. SERVIDIO:  Specifically on 183, Count 1 through 4,

4    was bad checks.  Count 6 was receiving stolen property.  And

5    7 through 10 were forgeries.  It was Count 5 that was the

6    theft by deception.  And the forgery counts themselves were

7    on the second page, Your Honor.

8          THE COURT:  But he said he never saw them.

9          MS. SERVIDIO:  Right.  He didn't see the forgeries, he

10   stated that.

11         THE COURT:  All right.  Anything else?

12         MS. SERVIDIO:  No, thank you.

13         THE COURT:  Mr. Patton, do you have something else?

14         MR. PATTON:  On the procedural to default on the

15   miscarriage of justice issue, just for Your Honor, you

16   entered an order on June 14th of 2007 asking -- Judge

17   McLaughlin sent the case back to you to provide the parties

18   with the opportunity to more fully address the application

19   of the document of exhaustion and/or procedural default and

20   to specifically address the issue of whether the dismissal

21   of Petitioner's claim of procedural default would amount to

22   a fundamental miscarriage of justice.  And then you ordered

23   the Petitioner to file a brief with you by July 12, 2007

24   addressing the issues set forth in Judge McLaughlin's

25   memorandum, and gave the Commonwealth until August 11, 2007

```
 1    to respond.

 2        I filed my -- I asked for an extension and received an

 3    extension and filed our motion and memorandum on the

 4    miscarriage of justice, and the Commonwealth did not file

 5    any response at all.  And when I filed my motion for

 6    evidentiary hearing, I laid that out, stated that their

 7    failure to file a response should have been deemed as a

 8    waiver on their part, or admission on their part, as to

 9    miscarriage of justice and asking that you schedule an

10    evidentiary hearing on the claims raised in the petition.

11    And you granted that order.

12        THE COURT:  I do remember that.  I remember very well

13    saying, well, they must have agreed and are willing to

14    defend it on the merits.  All right.  I understand.  All

15    right.  Anything else?

16        MR. PATTON:  No, ma'am.

17        THE COURT:  We're adjourned.  Thank you.  We'll take

18    this under advisement and issue a recommendation order.

19

20            (Hearing concluded at 11:32 a.m.)

21

22

23

24

25
```